MATTHEW L. LUTZ et ux., Plaintiffs, v. J. LENORE CUNNINGHAM, Appellant, and HOME BUILDING & LOAN ASSOCIATION, Appellee.

No. 47403.

(Reported in 38 N. W. 2d 638)

1038

August 5, 1949.

Breen, Breen & McCormick and Rider & Bastian, all of Fort Dodge, for appellant.

Loth & Melton, of Fort Dodge, for appellee.

BLISS, J.—This is another of the too many appeals to this court in which the appellant makes no attempt to properly abstract the testimony so as to present only such part thereof as bears upon the propositions in issue, but prints a copy of the transcript, as the record. Such practice is an imposition on the court and aids no one.

Many of the facts are stipulated and there is little factual controversy. On October 22, 1928, one Deppe held the record title to the residence involved herein—a pebble-dashed bungalow with a red tile roof on a lot with only a thirty-foot frontage in Fort Dodge. On the above date, Mogensen, who was apparently contemplating the purchase of the lot, entered into a written contract to sell it to the defendant-cross-petitioner, who was then Mrs. Lenore Frear. The latter then held a contract of purchase to another property in which she had an "equity." The purchase price provided in the Mogensen contract was $6000. She assigned her "equity" to Mogensen and received a credit therefor on the Mogensen contract of $1760, leaving a balance owing of $4240 to be paid in monthly installments of $40, commencing on November 17, 1928, and on said day of each month thereafter, until the principal sum had been reduced to the amount of the mortgage against the property. The contract debt bore interest at seven per cent computed semiannually with payments applying first on the interest and then on the principal. Time was of the essence of the contract, and it contained the usual clause giving the grantor the right of statutory forfeiture for specified defaults. When the price had been so re-

duced the purchaser would be entitled to an abstract showing merchantable title and a warranty deed in which the grantor would assume the payment of the mortgage indebtedness. The vendee in the contract agreed to regularly and seasonably pay all taxes and assessments on the property including those for 1928, and all thereafter imposed. The vendor reserved the right to keep the premises mortgaged up to $3500, and the vendee agreed to keep the property insured against all the elements up to $3500 during the life of the contract. The contract was never placed on record.

On December 14, 1928, Deppe conveyed the property by warranty deed to Mogensen. The deed was recorded the same day. On December 15, 1928, Mogensen and wife executed and delivered a promissory note for $3500 and a mortgage on this property securing payment of the note to the defendant Home Building & Loan Association. The mortgage was filed for record the same day. The mortgage debt drew interest at the rate of 58 1/3 cents a month on each $100 of the debt, payable in the sum of $41.42 at the time of executing the note, and a like sum on the fifth day of each month thereafter, until such time as the amount paid on the thirty-five shares of mortgagors' stock pledged to the Association, together with the profits to the credit thereof would equal the par value of $100 per share; said monthly payment being $21 for one month's dues on the shares of stock pledged, and $20.42 for one month's interest on the loan. The mortgagors agreed to furnish insurance on the property in the sum of $3500, and if they failed to do so or to pay insurance premiums the mortgagee might do so at the expense of mortgagors, and include the amount paid in the mortgage debt.

The cross-petitioner testified that she and her husband took possession of the property under the contract and paid Mogensen $240, or six monthly payments. The sixth payment would probably be the payment due April 17, 1929. On February 21, 1929, Mogensen and wife executed a warranty deed to the property to Wretman for one dollar and other valuable consideration and "subject to a mortgage of $3500 to the Home Building and Loan Association." When the deed was delivered does not appear, but it was recorded on April 26, 1929. Mogensen told

cross-petitioner that thereafter payments on the contract should be made to Wretman. The latter's records show that between May 21, 1929 and May 16, 1931, both inclusive, the tenants had paid Wretman twenty-two payments of $40 each, or $880 on the contract. This amount was $120 less than was due for the period. During this time Mr. Frear died, and early in 1931 Mrs. Frear moved to California. In May 1931, the property became unoccupied and she returned from California and put the house in order for another tenant. She testified that she thought she personally made the $40 payment on May 16, 1931, to Wretman. On this trip she rented the house to a Mr. Shaw for $40 a month. He occupied the place and under her instructions paid the rent to Wretman. Mrs. Frear at once returned to California, and from there sent $15 to the Association, as shown by its receipt to her, "for payments" on house, June 15, 1931. On September 25, 1931, she wrote a letter from Alameda, California to the Association. Neither the letter nor a copy of it was produced. It was the recollection of Mr. Klapka, secretary of the Association, that in her letter she inquired if the Association would be interested in purchasing any equity she had in the property. On October 1, 1931, Klapka, as secretary, wrote to her stating:

"We have your letter of September 25th enclosing order for $10 to apply on your loan payments.

"Just at this time, with conditions as they are, it would not be possible for us to take over your property so as to get the payments all in one place. Money is just too scarce for us to consider any loans at all. Probably when things get better we could look into this for you but for the time being at least we couldn't do a thing for you. However, the way it is being handled now should take care of everything satisfactorily until other arrangements can be made. * * *"

The letter then mentions that "your renters complained of difficulty with the furnace so they have had a furnace man look it over;" that the furnace company recommended some repairs costing $26.60, which the Association authorized. There is no evidence who paid for the repairs.

Mr. Klapka testified that, at the time the letter was written, Mr. Wretman, while behind in his payment on the mortgage debt, had been making part payments with regularity. Concerning the period during which Wretman had title to the property, Mr. Klapka, for the Association, testified:

"We had nothing to do with the handling of the property, and some reasonably close to contractual payments were being made on the mortgage, so that arrangement at that time was satisfactory. I was not managing the property. I presume Mr. Wretman was. I was not collecting the rents and I was not being called on to pay taxes or to make improvements or repairs. Either Mr. Wretman was doing that, or it wasn't being done, as it later turned out; but I was not asked to concern myself with the property at that time. I could gather from my reply to her letter of September 25th that she might have asked us to take over her equity. I see here I said I couldn't do it. * * * In other words we had all the money in the property that we wanted to, which was probably more than it was worth. At that time all we had invested in the property was the mortgage plus some delinquent taxes we paid. * * * Wretman was making payments on our paper. They were not contractual payments. They were made reasonably regularly, but reduced in size. In other words the mortgage was running behind. Any amounts Mrs. Cunningham paid to Mr. Wretman as shown on his statement did not come to us except just such payments as our books show he made to us. In other words the payments she testified she made to Mogensen and Wretman did not come to us. All that we were being paid was interest on the mortgage."

In the Spring of 1932, Mrs. Frear left California permanently for Alberta, Canada, where she married Mr. Cunningham, who died about two years before the trial.

On May 31, 1933, Wretman and wife executed a quitclaim deed of the property, in consideration of one dollar and other valuable consideration, to the defendant Association. It recited: "This deed is an absolute conveyance of title in effect, as well as in form, and is not intended as a mortgage or security of any kind." There was no mention of the contract in the deed.

As noted herein, in the deed from Mogensen to Wretman the latter had not assumed payment of the mortgage debt. In narrative form Mr. Klapka testified:

"When we took this property from Mr. Wretman there wasn't any question that it wasn't worth what was owing on our mortgage. Mr. Wretman is a business man in Fort Dodge.

"Q. Is there any reason why, if the property had been worth any more than was against it, that he wouldn't and couldn't have kept it? A. Well, if it was worth more than he owed us he certainly wouldn't have turned it back to us."

Mr. Klapka testified that until the deed was received from Mr. Wretman on or about June 1, 1933, neither he nor the Association had anything to do with the management or operation of the property at all, and it was simply the mortgage holder taking such payments as the owner gave it; that neither he nor his company in receiving the deed had any intention of releasing the mortgage, but intended to and did continue to carry the mortgage on their books as an active mortgage, representing their financial interest in the property. The mortgage never was released of record. He further testified that Wretman never turned over to the Association any contract between Mogensen and Mrs. Frear, nor did it ever have any copy of the contract, and that such information as the Association had about the contract was contained in a letter received from her and dated September 15, 1944. The Wretman deed to the Association was recorded December 8, 1942.

The cross-petitioner testified that after she made the $40 payment to Wretman on May 16, 1931, it was the last payment she made personally to anybody, and that since that time she had "never dealt with any tenants in the property at any time, or collected any rents, paid any taxes or made any repairs, and never corresponded with any of the tenants in the property as to what their arrangements were, or who they were paying, or how the property was being handled." She testified that she had some correspondence with Mr. Klapka, but the letters of neither were produced except as hereinafter noted. She had a sister and brother-in-law in Fort Dodge with whom she kept in

contact about the property. Neither was a witness. She visited them during the 1937 Christmas holidays and testified that she saw Klapka but once and inquired of him about the property and asked for a statement which he said he would send her. If she went to the property or talked with the tenant she omitted to so testify. Klapka testified that he had no recollection of seeing her on that visit. It was the only time she had been in Fort Dodge since she left it in June 1931.

After Wretman had abandoned the property and conveyed title to the Association in the summer of 1933 it took charge of it. The cross-petitioner had nothing to do with its taking over the deed or possession. The Association received nothing on the property from December 1932 to September 5, 1933, when $22.50 rent was paid directly to it. No taxes had been paid since the Association had paid them under its mortgage in the sum of $73.38 on December 17, 1930. The taxes for 1930, 1931 and 1932 were unpaid and delinquent. For over ten years this property received no attention from the cross-petitioner. She did nothing to comply with the provisions of the Mogensen contract. She did not pay for taxes, insurance or upkeep. She knew that any interest she had in the property was subject to a first mortgage of $3500, but she evidenced no concern as to whether its provisions were being performed during these years.

On June 12, 1940, Mr. Klapka wrote Mrs. Cunningham in Canada, stating:

"We find it will be necessary to have some action to clear up the title on the property at 1620-12th Avenue South on which we hold a delinquent first mortgage. We had hoped it would be possible to sell this at a price that would permit you to realize something on your investment in the property, but we don't believe that can be done. We have had the property priced at an amount that would clear our mortgage but it just won't sell at that price. We have concluded to put a price on this property that will turn it even though we take a loss. In order to do this it will be necessary that some arrangement be made to dispose of the contract which you hold on the property. This can be done, of course, by 30 days' publication in the Fort Dodge Messenger of our intention to forfeit this contract. * * *"

The writer further stated that the cost of such publication would probably be $10 or $15 and suggested that he would pay that sum to her for an assignment of the contract by her and her husband. On June 30, 1940, Mrs. Cunningham replied with a letter in which she refused the offer and strongly intimated that she was being robbed of her home.

Hearing nothing further from her, the Association, without forfeiture of cross-petitioner's contract or foreclosure of the mortgage on September 15, 1943 sold the property to Clarence B. and Anne Kuhl, as joint tenants for $3750, with a down payment of $375, and deferred payments of $32.50 a month. The contract was recorded. On April 11, 1944, the vendees in this contract assigned it to the plaintiffs Matthew and Bernice Lutz. In the decree for these plaintiffs against both defendants herein the Association was ordered to execute a warranty deed of the property to Mr. and Mrs. Lutz, in performance of the Kuhl contract. The deed was made March 29, 1946, and recorded the following day. In the decree, Mrs. Cunningham was given the right to cross-petition against the Association "without seeking to subject the land thereto." Mr. and Mrs. Lutz, for a consideration of $6500, deeded the property to Lydia May Bowen on April 5, 1946. The real estate commission on the Kuhl sale was five per cent of the sale price, or $187.50. In addition there was an abstract of title expense.

Answering the question of what, in his opinion, the property was fairly and reasonably worth when sold to the Kuhls, Mr. Klapka testified:

"It had been on our list for four or five years at that same price, and had been shown to numerous people. Apparently it was all it was worth, or it would bring. We weren't trying to sell it at a bargain. We were trying to get as much as possible and were a long time getting that much out of it. It was not worth more on the market than we got for it. * * * I consulted our attorney [one not involved in this litigation] concerning the sale. His advice was to go ahead and sell it; that the amount owing on Mrs. Cunningham's contract was so much more than the actual value of the property that even if she was in a mood to redeem, it would be a very poor and foolish

investment; and he advised us to go ahead and sell it. We sold this property, as we did any property, through legalized brokers, the Mulholland Realty Company. We employed them to act as rental agents for us on that property, as well as all other properties we owned. We attempted to get top rental at all times. As you recall, that was in the depression years, and there were hundreds of vacant houses, so rentals were not very high, and it was not easy to rent properties, particularly this one. Like other properties during those times it was not continuously rented at all times, and it was rented at a very low figure. For a long period of time it was rented for less than the monthly interest on the loan. It was rented as regularly as other properties would be, at the going or market rental. The property was in rather run down condition, naturally, when we got it. It had been neglected. We had to keep it in tenantable condition. The amounts we paid for repairs were below the market because we had some very satisfactory connections and got our work done very reasonably."

Mr. Klapka testified that the Association received no request from Mrs. Cunningham inquiring about the property or the amount owing by her on her contract prior to the execution of the Kuhl contract in September 1943, other than her letter of September 25, 1931. After refusing in her letter of June 30, 1940, to assign her contract to the Association, she did not communicate again until June 26, 1944. Land values had advanced at that time. She wrote that she was in a better position to take care of her obligations, and asked for an itemized statement of her indebtedness. Mr. Klapka replied and asked her for more complete information about her contracts and the payments she had made to Mogensen and Wretman. After much delay, on June 4, 1945, he wrote her that because of data not in their records he was unable to figure out exactly what she owed. He informed her of the amounts of some major necessary repairs, and that for a long period the rental income was insufficient to pay interest, taxes, repairs and insurance, and that the balance then due on their mortgage was $5046.15 including interest and other expenditures above stated, but not including interest in considerable amount on the other expenditures. In

the fore part of 1946 she came to Fort Dodge and employed attorneys. At that time the Association furnished her with an itemized statement from its records of receipts and disbursements on the property from July 1, 1933, after the property was delivered to it, to September 15, 1943, when it was sold to the Kuhls. The total receipts were $3511.65 and the total disbursements were $2261.46. The favorable balance of $1250.19 was far less than the interest owing and unpaid.

The Association also introduced an itemized statement of cross-petitioner's contract from its inception on October 22, 1928 to September 15, 1943, the date of the sale to the Kuhls, including not only the $1760 "equity", accepted as a cash payment, but also the $240 paid to Mogensen and the $880 paid to Wretman—none of which payments on the contract was received by the Association—and including also all net rental payments received after control of the property was taken by the Association, as shown by its books. The net rentals were the difference between what the property actually produced in the way of income and what was paid out for repairs and other operating expenses, except taxes or interest, for which specific charges were made. This statement showed that the balance owing by cross-petitioner on her contract as of September 15, 1943, was $6238.40. There was no evidence of the reasonable value of the $1760 "equity."

A statement was introduced of the $3500 mortgage from December 31, 1932 to September 15, 1943, showing interest accrued at $20.42 a month for 128½ months, the credits and charges. Whether the cross-petitioner lived in the house or leased it to others, the upkeep expenditures were hers to bear. Under her contract she agreed to pay the taxes and insurance charges. The rent for a long period was insufficient to pay the interest on the contract price. Neither she nor anyone else other than the Home Building & Loan Association ever paid any taxes for the fourteen years since the inception of the mortgage debt. The only credits or payments on the principal of the mortgage were some credits on the Association stock pledged as collateral security for the debt, totaling $230.50. On September 15, 1943, when the Association sold the property, the amount owing on

the mortgage debt was $5195.70. The amount owing on the contract at that time was $6238.40. The sale price was $3750, and the sale expense was approximately $200. The undisputed evidence was that the property was sold for all it was reasonably worth on the market. The only evidence of the value of the property in June or July 1945 was that "it might have sold for around $4500." The cross-petitioner used Mr. Klapka as her witness. From his occupation he should be well qualified as a judge of residence property values in Fort Dodge. He was asked: "If this property was worth $6000 in 1946 what would it be worth today?" He answered: "I think it was sold in 1946, which was right at the peak of real estate prices. I don't think it would have increased any since then. The big push on real estate was in the fall and winter of '46; fall of '45 and early part of '46."

Appellant offered no other testimony of the value of this property at any time. The statements above referred to, which were introduced in evidence, were taken from the books of the Association which were in court for examination. They were not challenged in any way.

There is no charge of fraud in cross-petitioner's pleadings, but there is intimation of it in appellant's argument. The record does not sustain any such contention. The purchase looked like a sound investment in 1928. The property was appraised by F. C. Minogue, E. M. Klapka and Daniel Rhodes at $5500 at that time. The Association loaned $3500 on the property. Then came several years of depreciated values. The vendee could not carry the burden and realized it. She was either unable to or did not care to put any fresh money in it. There were grounds for foreclosure almost from the beginning and also for forfeiture of the contract. The Association took advantage of neither remedy. Mogensen got out from under early. Wretman abandoned the property. The Association realized that it was caught. It had no alternative other than to take the property and reduce its loss as much as it could. In its letter of October 1, 1931 to cross-petitioner while Wretman was making good efforts to carry the load it refused to assume any of her financial burden. In this letter it said: "Probably when things get better we could

look into this for you but for the time being at least we couldn't do a thing for you. However, the way it is being handled now should take care of everything satisfactorily until other arrangements can be made." Into this last sentence the appellant seeks to read a promise to her that it would assume her burdens and see her successfully through her venture. There is no reasonable basis for such contention. Wretman then owned the property and was "handling" it.

Mr. Klapka is criticized because he did not notify appellant of the sale to Mr. and Mrs. Kuhl. He had suggested in 1940 that some attempt be made to dispose of the property, and she had sharply charged him with misconduct. It would have been better had he proceeded by forfeiture. But he completed the sale openly. The contract was recorded. He states that he told cross-petitioner's sister's husband of the sale, and assumed that cross-petitioner must have known of it. The brother-in-law was not called by her as a witness.

Mr. Klapka is also taken to task for not telling appellant when she wrote for a statement in 1944 of how much she owed, that the property was already sold. He testified that he assumed she knew it. He also testified that if she was really desirous of recovering the property then he could have readily bought it back for her for much less than what she owed on the contract. We find no basis in the record for any insinuations of discreditable conduct against the Association or Mr. Klapka.

The able and experienced trial court after reviewing the record and discussing the pertinent legal principles rendered judgment and decree as stated in the foreword of this opinion for $55 against the Association.

I. The cross-petitioner-appellant, in her argument to this court, asked that we reverse the decree of the district court and render judgment against the Home Building & Loan Association for $4709.79, broken down into the following items:

1. Original payment on contract to Mogensen.......$1760.00;
2. six $40 payments on contract to Mogensen...... 240.00;
3. payments on contract to Wretman to May 16, 1931 880.00;
4. net rentals collected by Association from June 4, 1931 to December 13, 1932, both inclusive........ 579.60;

5. net rentals collected by Association, September 5, 1933 to September 15, 1943 . . . . . . . . . . . . . . . . . . . . . . 1250.19.

■ Cross-petitioner's suit is not one for damages for a breach of the contract. It would avail nothing if it were, as the record clearly establishes that she was not damaged by any breach of contract. The trial court clearly stated the issue and the principles of law involved, to wit, the cross-petitioner "can affirm the contract and sue for damages for breach or she can disaffirm the contract by way of rescission and sue to recover back what has been paid so as to be restored to the status quo at the time the contract was made. She cannot, however, do both. She cannot retain the benefits of the contract and at the same time seek restitution of payments made by her. * * * In the present matter the value of the property at the time of the breach, plus the amounts paid by the cross-petitioner, was less than the contract price. The contract price, which includes unpaid, accrued interest up to the time of the breach, together with the amounts due the vendor for taxes and insurance premiums advanced, exceeds the total of the amounts paid by the cross-petitioner to Mogensen and to Wretman and to the defendant [Association] in the form of net rentals or otherwise, plus the value of the property at the time of the breach. Her remedy for breach of contract is therefore worthless. If any recovery is to be had by her, it must be on the basis of a disaffirmance and rescission of the contract and a recovery of what she has paid on the purchase price. * * * the sole question is whether or not Mrs. Cunningham is entitled to relief in the nature of rescission as against the * * * Association."

The suit which cross-petitioner has brought is clearly one for rescission of the contract. In her cross-petition she alleged: "and this cross-petitioner therefore elects, by these presents, to cancel the said agreement and to require accounting by the said * * * Association to her and the amounts paid by her on the said contract." She prays "that her right, title and interest in and to said real estate above described may be established as a lien thereon as against said * * * Association."

Under the court's order granting cross-petitioner the right to sue the Association she could have no lien against the prop-

erty, since it provided that the cross-petition "shall not include any claim against the land, but only a claim against the Association individually." However, if she were entitled to a lien it could be of no aid to her unless she established the right to some amount for which a lien would be security. The fact that she may have a vendee's lien, or the nature of her grounds for rescission, or that she may claim overreaching or fraud, does not increase her right, nor add to any amount she may be entitled to recover.

■ II. The principles of law involved in the rescission of a contract to sell and purchase real property are well understood and require no discussion. Such rescission means the cancellation of the contract and the placing of each party to it in statu quo —in the same position with respect to the property and his rights to it as he had before the contract was made. It is effected, ordinarily, by each party restoring to the other, as near as can reasonably be done, what he received under the contract. Dickerson v. Morse, 203 Iowa 480, 484, 212 N. W. 933; Frederick v. Davis, 133 Iowa 362, 110 N. W. 611; Hendrickson v. Hendrickson, 51 Iowa 68, 70, 50 N. W. 287; Anderson v. Haskell, 45 Iowa 45, 47; Finch v. Gates, 210 Iowa 859, 861, 229 N. W. 832; Butler Mfg. Co. v. Elliott & Cox, 211 Iowa 1068, 1071, 1072, 233 N. W. 669; Pedley v. Freemen, 132 Iowa 356, 358, 359, 109 N. W. 890, 119 Am. St.. Rep. 557.

Cross-petitioner seeks recovery from the Association of the sum of $4709.79. The record falls short of showing that it received any such sum from her. The first item, in point of time, which she insists is a part of the total claim, is the credit of $1760 which Mogensen allowed her for the "equity" which she assigned to him. The record is silent as to what the assignee did with it. What actual value it had does not appear. It was not received by the Association, and there is no evidence that it or the property received any benefit from it. What we have said of the first item applies also to the second item—the six payments of $40 each which the Frears paid to Mogensen while they occupied the property. It was not received by the Association and the record does not disclose what Mogensen did with it. It may be said to fairly represent the rental value or the value

of the use of the property while the Frears occupied it. The third item of the total claim is the $880 which Wretman received in rent from the tenants of the property down to May 1931. None of it was paid to or received by the Association. Wretman operated a plumbing business and had other income. What he did with the rent money is not shown. It was received as rent and was probably a fair measure of the occupation value of the property. The fourth item of $579.60 is stated by appellant to be: "Net rentals collected by Association from June 4, 1931 to December 13, 1932." This period preceded the conveying of the property by Wretman to the Association on May 31, 1933. There is no foundation for the assertion that these rentals were collected by the Association. The uncontradicted evidence is that Wretman owned and was in charge of the property during this period and received whatever rentals were paid, and that the Association exercised no control over it and collected no rents. Wretman was paying no taxes or insurance and was in arrears on the interest on the mortgage indebtedness during this time.

The fifth item of the $1250.19 was the credit balance or the difference between the total receipts of $3511.65 from the property and the total disbursements of $2261.46 of the over-ten-year period during which the Association had title to and control of the property prior to the Kuhl sale. This balance was much less than the arrears in interest which the appellant owed on the contract, and would be wiped out on application thereto.

The cross-petitioner is not entitled to recover anything on any of the five items comprising the aggregate claim of $4709.79. There can be no serious contention that there should be a recovery for the $1760 item, and all items are without merit. The trial court was right in holding that the Association was liable only for the return of what it received and could not be deemed to have received what its predecessors in title, Mogensen and Wretman, had obtained.

III. It is the general rule that a vendee in a sale contract, who rescinds it and sues a vendor to recover purchase money, is entitled to recover only so much of the purchase price as the vendor received, and cannot recover from him any part of the purchase price paid to that vendor's assignor or grantor

or predecessor in title. The action will lie only for the money or property which was received by the vendor against whom the action was brought.

In Hafner v. A. J. Stuart Land Co. (and Mr. and Mrs. Stuart), 246 Mich. 465, 472, 224 N. W. 630, 632, thirty-three suits in equity were consolidated in which rescission was asked because of fraud in the inception of real estate contracts in which the land company was the vendor. Mr. and Mrs. Stuart were subsequent grantees of the company. The decree was personal against the Stuarts for the whole amount paid on the contracts with interest. On appeal the decree was modified. The court said:

"The personal liability of the defendant corporation is not greater here than the total of payments received by it from plaintiffs on the contracts, with interest. And personal liability of defendants Stuart is limited to the total of payments received by them from plaintiffs on the contracts after July 31, 1925 [the date of the deed to the Stuarts]."

The Hafner case was cited and followed in Van Looyengoed v. Allencrest Gardens Corp., 265 Mich. 182, 186, 251 N. W. 317, 318, a suit for the rescission of two land contracts for fraud. The defendant Borgan was the president and salesmanager of the corporation. The lots in question were sold by him through two of his subagents. There was a decree for rescission and repayment of the consideration against the company and Borgan. On appeal it was reversed as to Borgan, and affirmed in all other respects. The court said:

"But we disagree with the court in his finding and decree of personal liability on the part of defendant Borgan for the repayment to the plaintiff of the money paid on the contracts. This is not a suit at law for damages resulting from the fraud. It is a suit in equity for rescission. She is entitled to a rescission and restitution from the corporation of the money paid on the contracts. She can recover nothing from Borgan. He was not a party to the contracts. He personally received no payments. Though he participated in the fraud and may have received a commission from the corporation for the sale he cannot in this action be held personally liable."

See also Barker v. Fordville Land Co., 264 Mich. 95, 249 N. W. 491; Engelbercht v. Davison, 204 Iowa 1394, 1396, 1397, 213 N. W. 225; Valley Bank of Phoenix v. Josten, 18 Ariz. 365, 161 P. 876; Longway v. Newbery, 13 Cal. 2d 603, 91 P. 2d 110, 116; Schroeder v. Morris, La. App., 20 So. 2d 437; 66 C. J., Vendor and Purchaser, section 1617c, citing Winn v. Williams, 200 Iowa 905, 909, 205 N. W. 541.

In Winn v. Williams, supra, 200 Iowa 905, 907, 909, 205 N. W. 541, 542, the litigation grew out of the land boom in 1919 when many farms were resold several times before March 1, the day of settlement. Defendant Williams sold a farm to Handley for $36,000, who resold to Eigenheer for $37,600, who sold to Nellie Hennessy for $39,200, who sold to Winn for $40,400. March 1, 1920 was the day of settlement for all the sales. Winn did not know of the prior sales when he bought of Miss Hennessy. There was trouble over the title. Miss Hennessy had no title. But Winn made his settlement, pending the perfecting of the title, on March 1, 1920. All settlements were being made at the same bank. Winn paid $7400 to the bank, which gave $3800 of it to Miss Hennessy and distributed the rest among the other vendors and vendees. Miss Hennessy died and Winn refused to take a crosscut deed from Williams, and finally rescinded and asked recovery of the Hennessy estate of the entire amount he had paid to the bank. The bankers were made parties, and Williams et al. intervened. This court affirmed and said:

"Upon final hearing, the court dismissed all of the petitions in intervention, canceled the Hennessy contract, and established a claim against her estate * * * for $3800 * * *. The reason assigned by the court * * * for refusing to allow the claim in full, was that $3800 was all that the deceased ever received. * * * Appellee was entitled to recover from the estate of Nellie Hennessy what he paid her on the contract, and nothing more. The court dismissed the petition against both banks upon the theory that they retained no part of the funds, and had nothing for which to account."

The factual situation in the case before us demands a ruling such as was made in the cases above cited. The Association was

not a party to the contract. It was not instrumental in its consummation. It did not participate in any way in what the parties did under it. There was no fraud on its part. The title to the property was forced on it. It took the property and title subject to the burden of the contract. It received no benefit from it nor aid from the holder of it. It is obligated to Mrs. Cunningham for no part of the amount which she is trying to recover.

IV. There is an additional reason for this. Under her contract she was the equitable owner of the property subject to the prior lien of the mortgage, and, in law, the possessor of it, until she was dispossessed by the sale to a good-faith purchaser, unless she had earlier abandoned it. If she had not abandoned it, the sale by the Association was a ground for her rescission. But upon her rescission her right of possession and the benefits of possession reverted to and were restored to the Association as of the day it became the owner. It is the well-established law generally and in Iowa that when a vendee of a real estate contract rescinds it he is required to account to the vendor for the value of his use or occupancy of the property under the contract, *with interest*. See 55 Am. Jur., Vendor and Purchaser, section 544; id. section 611, pages 1003, 1004; 2 Black on Rescission and Cancellation (1916), section 634, page 1461; Rhodes v. Stone, 25 Ky. L. Rep. 921, 76 S. W. 533, 535; Kilpatrick v. Smith, 236 Iowa 584, 596, 597, 19 N. W. 2d 699; Kunde v. O'Brian, 214 Iowa 921–927, 243 N. W. 594; McLain v. Smith, 201 Iowa 89, 97, 202 N. W. 239, 242; Fagan v. Hook, 134 Iowa 381, 389, 105 N. W. 155, 111 N. W. 981; Campbell v. Spears, 120 Iowa 670, 676, 94 N. W. 1126; Nolan v. Foley, 141 Iowa 671, 676, 120 N. W. 310. While the rescinder is not charged with "rent", in the common acceptation of the word, but for the benefit derived from his use of the property, this amount is usually reckoned as being equivalent to the fair and reasonable rental value of the land. All of the items for recovery, except the $1760 item, were derived from the rentals of the property. Were Mogensen or Wretman parties to this action each would be entitled to have restored to him the rental values during his ownership, and likewise the Association is entitled to all of the

rentals received during its ownership, including, of course, the balance of $1250.19—the fifth item. Since it now possesses that sum and no restoration to it is necessary, it may hold it. Had Mrs. Cunningham paid for any improvements or taxes she would be entitled to a credit therefor, but she had no such expenditures.

██ ██ V. The trial court held that the Association's mortgage was merged in Wretman's deed to it. The record does not sustain the finding. Wretman never assumed the mortgage. By his deed he parted with all his title, without any right of redemption. The Association did not intend that he should have such right. Whether the mortgage was merged with respect to Mrs. Cunningham was another matter. Merger is a matter of intention. There is no evidence of such intention. It is to the contrary. The presumption is against such merger. The records of the Association show that until the sale to the Kuhls the mortgage was always carried as an asset, and the live instrument showing its financial investment in the property. The statements introduced show this. The deed was an unrecorded nonledger asset. Klapka testified that there was no intention to merge. In his letter of June 12, 1940, seven years after receiving the Wretman deed, he wrote Mrs. Cunningham that "we hold a delinquent first mortgage on the property at 1620-12th Avenue South." We find that there was no merger of the mortgage with the deed, as to Mrs. Cunningham. See Andrew v. Woods, 217 Iowa 453, 252 N. W. 112; Guaranty Life Ins. Co. v. Farmers Mut. Ins. Assn., 224 Iowa 1207, 278 N. W. 913; Harrington v. Feddersen, 208 Iowa 564, 226 N. W. 110, 66 A. L. R. 59; Woodward v. Davis, 53 Iowa 694, 6 N. W. 74.

██ VI. For more than ten years before the sale to the Kuhls the cross-petitioner showed such inattention to, and disregard of, the property, and of her obligations under her contract, as to establish her abandonment of the property and repudiation of the contract, and to justify the Association in so believing when it sold the property. Her conduct speaks more convincingly than some interest manifested after the property was sold. See Lake v. Bernstein, 215 Iowa 777, 246 N. W. 790,

102 A. L. R. 846; Shupe v. Thede, 205 Iowa 1019, 218 N. W. 611; Mintle v. Sylvester, 202 Iowa 1128, 211 N. W. 367.

The final order, judgment and decree as supplemented on June 18, 1948, is affirmed.—Affirmed.

HALE, C. J., and OLIVER, GARFIELD, WENNERSTRUM, SMITH, and HAYS, JJ., concur.

MULRONEY, J., takes no part.

MANTZ, J., not sitting.